In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1716

VINCENT RAY DEERING,

*Plaintiff-Appellee,*

*v.*

NATIONAL MAINTENANCE & REPAIR, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:09-CV-676-DRH—**David R. Herndon**, *Chief Judge.*

ARGUED OCTOBER 29, 2010—DECIDED DECEMBER 2, 2010

Before POSNER, KANNE, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* Deering, employed as a riverboat pilot by National, sued it for injuries he sustained in an accident. National counterclaimed for serious damage that it alleged Deering had caused the boat—namely, sinking it. The district court dismissed the counterclaim, precipitating National's interlocutory appeal, which presents questions of admiralty law and of jurisdiction over interlocutory appeals in admiralty cases.

On the day of the accident (March 11, 2009), with the Mississippi River at flood stage (Jim Salter, "Towns Along Mississippi River Prepare for Springtime Flooding," *Southeast Missourian*, Mar. 11, 2009, www.semissourian.com/ story/1509416.html (visited Nov. 29, 2010)), Deering was having trouble controlling the towboat that he was operating to move barges at a National drydock facility. He claims that as a consequence of National's negligence the steering mechanism on the towboat was defective, that he warned his supervisor that the defect made the maneuvers that he had been directed to perform unsafe in high-water conditions, but that the supervisor ordered him to continue. Because of the difficulty of controlling a towboat with a defective steering mechanism in such conditions, the boat became wedged at a dangerous angle against the barge that it was towing. Another boat approached to offer assistance, but at excessive speed. At the last minute, to avert a collision, its captain threw its engines into reverse, which caused a surge of water that swamped Deering's boat. The boat sank rapidly with Deering still on board and he was swept underneath the adjoining barge. He survived, but suffered injuries that ended his career as a riverboat pilot.

He sued National in an Illinois state court under the Jones Act. The admiralty counterpart to the Federal Employers' Liability Act, the Jones Act states that "a seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to . . . a railway

employee apply to an action under this section." 46 U.S.C. § 30104. Deering also sought relief under the general admiralty law—the judge-made law, like common law (which however is inapplicable to maritime activities), that unless displaced by statute governs those activities. General admiralty law entitles an injured seaman to maintenance (shelter until he recovers) and cure (treatment), plus lost wages—all irrespective of any negligence on his part—and, if his injury was caused by the unseaworthiness of the ship on which he was injured, to damages comparable to those available in a nonmaritime personal injury suit, *The Osceola*, 189 U.S. 158, 175 (1903), subject to the (partial) defense of comparative negligence. *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408-09 (1953); *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 908 (6th Cir. 2006); see generally *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 815 (2001). The parties ignore Deering's general admiralty claims; we discuss them briefly later.

National filed a petition in federal district court under the Limitation of Liability Act, 46 U.S.C. §§ 30501 *et seq.*, which so far as bears on this case limits a shipowner's liability to the ship's value. 46 U.S.C. § 30505(a). National contends that the towboat, though worth $800,000 before it sank, has a salvage value of only $30,000, and it seeks to limit its liability to Deering to that amount. We take no position on the merits of either the limitation of liability claim or Deering's personal injury claim, both of which remain pending in the district court.

The district judge ordered Deering's state court action stayed, and Deering then refiled his Jones Act

and general admiralty law claims in the district court. National counterclaimed, seeking damages of $800,000 (the figure should really, one would think, be $770,000, in recognition of the towboat's salvage value; but we'll ignore that point, as do the parties). National claims that the accident in which the towboat sank was at least partially attributable to negligence on the part of Deering.

Deering moved to dismiss the counterclaim. The judge granted the motion on the ground that counterclaims in the nature of setoffs to Jones Act claims are forbidden. National appeals under 28 U.S.C. § 1292(a)(3), which allows interlocutory appeals "determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." See Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 16 *Federal Practice and Procedure* § 3927 (2d ed. 1995). Before taking up the merits of the appeal we must satisfy ourselves that it is within our jurisdiction.

The original and still central purpose of section 1292(a)(3) is to allow the determination of liability to be appealed before relief is ordered. The reason is that relief in an admiralty case is traditionally determined in a separate proceeding before a special master (called a "commissioner in admiralty"), and often that proceeding is protracted and therefore costly, *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 670 (7th Cir. 1998) (per curiam), though more commonly so in cases involving collisions, salvage, towage, insurance, or general average than in cases of personal injury—but the counterclaim does seek damages for the destruction of a ship, albeit a small one.

Although section 1292(a)(3) does not say that *all* rights and liabilities of the parties must be decided before an appeal can be taken, most cases say that its application should hew closely to the original purpose that we just described. E.g., *id.* at 669-70; *Evergreen Int'l (USA) Corp. v. Standard Warehouse*, 33 F.3d 420, 424-26 (4th Cir. 1994). The reason is the disfavor in which interlocutory appeals in federal cases generally are held. But this concern has diminished force in a case in which an interlocutory admiralty order resembles the kind of nonmaritime interlocutory order that would be appealable, albeit only with the consent of the district court, under 28 U.S.C. § 1292(b) (which also requires the consent of the court of appeals) or Fed. R. Civ. P. 54(b)—consent not required by section 1292(a)(3). The issue presented by National's appeal is a "controlling question of law," 28 U.S.C. § 1292(b), and also an issue that arises from a separate claim within the meaning of Fed. R. Civ. P. 54(b); in both respects it is the kind of interlocutory appeal that is frequently allowed even in nonmaritime cases.

And note that whether National should be allowed to counterclaim for property damage is a separate issue from the merits of either Deering's personal injury claim or National's limitation of liability claim. The facts of the counterclaim and the facts of Deering's claim are entwined but none of the facts bears on the issue of law presented by National's appeal. A number of admiralty cases allow interlocutory appeals in circumstances such as these. *Continental Casualty Co. v. Anderson Excavating & Wrecking Co.*, 189 F.3d 512, 516-18 (7th Cir. 1999); *Brother-*

*hood Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 324-25 (7th Cir. 1993); *Stewart v. Dutra Construction Co.*, 230 F.3d 461, 465 (1st Cir. 2000), reversed on other grounds, 543 U.S. 481 (2005); *In re Complaint of Nautilus Motor Tanker Co.*, 85 F.3d 105, 109-10 and n. 3 (3d Cir. 1996); *Kesselring v. F/T Arctic Hero*, 30 F.3d 1123, 1125 (9th Cir. 1994).

There is another jurisdictional issue, however: National's notice of appeal was untimely. But it had filed a Rule 59(e) motion in the district court within the period for appealing from the dismissal of the counterclaim, and as the motion contained all the information that a notice of appeal is required by Rule 3(c) of the appellate rules to contain—just like the appeal brief held in *Smith v. Barry*, 502 U.S. 244, 248 (1992), to do service for a notice of appeal—National's motion likewise sufficed.

So we have jurisdiction, and proceed to the merits.

General admiralty law, like common law, creates liability for negligent damage to property. But shipowners, unless they are trying to reduce or eliminate their liability for personal injuries caused by their negligence, do not sue their employees for property damage except in the very rare case in which the employee is so highly paid as to be worth suing. In the case of seamen, even when they are riverboat pilots rather than just deckhands, such suits are unknown—unless, as in this case, the seaman is seeking damages from the employer. As a practical matter, then, a suit or counterclaim by a shipowner against a seaman is a setoff

against the seaman's personal injury claim; the question is whether such a setoff is permissible.

Setoffs in personal injury suits by employees are addressed in section 5 of the Federal Employers' Liability Act, 45 U.S.C. § 55, which like the rest of that statute is incorporated into the Jones Act by reference. Section 5 says that "any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: *Provided,* That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought." National's counterclaim, the only purpose of which could be to exempt itself from liability to Deering (as further shown by its not having sued the pilot of the boat who contributed to the accident by approaching National's towboat at an excessive speed—and against whom Deering has filed a third-party complaint for negligence), is a good description of a "device . . . the purpose or intent of which shall be to enable [the shipowner] to exempt itself from any liability created by [the Jones Act]." In a filing in the district court National itself called its counterclaim a "setoff."

The setoff proviso in section 5 supports the inference that the word "device" embraces all setoffs with the

exceptions (irrelevant to this case) specified in the proviso, as otherwise there would be no need for an express exclusion. Ordinarily we would put little weight on this point lest we be attributing an unrealistically high degree of precision and care to legislative drafts-men in an era in which congressional staffs were rudi-mentary. But when the FELA was enacted, a railroad's right to recover damages from an employee on account of property damage caused by the employee's negligence was limited, either in law or as a matter of custom, to setoffs (whether or not formally denominated as such) against claims by employees for unpaid wages. William P. Murphy, "Sidetracking the FELA: The Railroads' Property Damage Claims," 69 *Minn. L. Rev.* 349, 367-72 (1985). This suggests that the setoff proviso in section 5 may indeed have been based on an understanding that the courts would deem any property claim by a railroad that had the effect of a setoff against an employee's per-sonal injury claim to be a forbidden "device." Hence the need to carve out from the prohibition of setoffs in section 5 those that Congress wanted to permit.

Moreover, when the FELA was enacted most property claims by railroads against their employees were based on the employees' having expressly assumed in their employment contracts liability for damaging the em-ployer's property, and therefore fell under the "contract" bar of section 5. *Id*. It would be surprising if Congress had meant to countenance an identical result based on a tort right asserted by employers to which the worker had *not* waived objections in his employment contract.

National argues that the phrase "any device whatsoever" must be confined to documents that are just like a "contract, rule, [or] regulation." In so arguing it invokes the rule of interpretation known as *eiusdem generis* (Latin for "of the same kind"). But like most rules of interpretation this one is not so much a rule as an item in a checklist of considerations bearing on the sensible interpretation of a document. Words in a string often are intended to bear similar meanings. But not always—and not in this instance. The fact that the statute tacks "whatsoever" on to "any device" is a clue that "device" is a catch-all, cf. *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 588-89 (1980), in recognition of the incentive of employers to get around the FELA's generous provisions—generous relative both to the common law of torts and workman's compensation law—for injured employees. The fact that Congress didn't think to say that a counterclaim for property damage was a forbidden device for extinguishing the employer's liability for injuries to his employees confirms the wisdom of including a catch-all.

Anyway National's "device" is much like the first word in the string—"contract." National's counterclaim has the same effect as would a provision in its employment contract with Deering waiving National's liability under the Jones Act if he was injured in an accident that caused property damage to National—and of course such a contractual provision would be unenforceable. So why shouldn't a differently named "device" of identical purpose and consequence likewise be unenforceable?

The destructive effect on an employee's personal injury claim of accepting National's position would be

magnified by two features of admiralty law that have no counterpart in a counterclaim in an FELA case: comparative negligence and limitation of liability. Although the FELA substitutes comparative for contributory negligence as a defense to the employer's liability to an injured employee, 45 U.S.C. § 53, defenses against a counterclaim for property damage are governed by state law, which may or may not substitute comparative for contributory negligence as a defense to the counterclaim defendant's liability (in this case, Deering's liability in negligence for causing the towboat to sink, were that proved). But an *admiralty* counterclaim for property damage would, as we'll see, always be subject to a defense of comparative negligence. And under comparative negligence National's damages would merely be reduced rather than eliminated by proof that its negligence had contributed to the accident.

To appreciate the significance of this point, suppose that National's negligence was 96 percent responsible for the sinking of its towboat and Deering's negligence 4 percent responsible. Four percent of the loss from the boat's sinking ($800,000) is only $32,000. But that's $2,000 more than National's liability to Deering on account of his injury—a liability capped, National claims, at $30,000. So Deering, although seriously injured (and in the present posture of the case we must assume seriously injured because of negligence by National), would end up not with positive damages or even zero damages but with negative damages: he would owe National money. That would be like the outcome in *Cook v. St. Louis-San Francisco Ry.*, 75 F.R.D. 619 (W.D. Okla. 1976). An injured

railroad conductor was awarded $46,000 in damages—and the railroad, which counterclaimed for property damage, was awarded $1.2 million in damages, leaving the plaintiff with no recovery and a large, though doubtless an uncollectible, debt. See *Cavanaugh v. Western Md. Ry.*, 729 F.2d 289, 297 (4th Cir. 1984) (dissenting opinion).

Ordinarily the effect of the statutory limitation of liability conjoined with a counterclaim for property damages would not be so dramatic. The ship would not be sunk and so the shipowner's liability to the seaman would not be limited to a low amount (remember the limitation is to the value of the ship); and the amount of property damage caused by the seaman would be small and so the offset to the plaintiff's personal injury claim would also be small. But rarely in such cases would the shipowner bother to counterclaim for property damage (other than as a means of pushing up the seaman's litigation costs and so forcing him either to abandon his suit or settle for a nominal amount). This is only the third reported maritime appeal involving a counterclaim to a personal injury claim in the 70-year history of the Jones Act.

In the first, *Moore-McCormack Lines, Inc. v. McMahon*, 235 F.2d 142 (2d Cir. 1956), the propriety of the counterclaim was assumed rather than discussed; anyway the counterclaim was based on a contract rather than on tort law. The second case is discussed in the next paragraph. There are a few analogous cases, as we'll see, under the FELA, but not many. The poverty of cases should allay anxiety that seamen who damage their employer's

property will seek immunity by filing trivial Jones Act claims (a claim that the seaman cut his finger and seeks reimbursement for the cost of a Band-Aid, for example). The employer will not sue a seaman for damage to property except as a setoff to a *substantial* claim of damages for personal injury.

National places all its eggs in a basket called *Withhart v. Otto Candies, L.L.C.*, 431 F.3d 840 (5th Cir. 2005). The district judge in the present case refused to consider *Withhart* because he mistakenly believed that a judge of this court had criticized him in another case for citing a decision by a court of appeals other than our court of appeals. What is true is that district judges are bound by the decisions of the court of appeals for their circuit (unless inconsistent with decisions of the Supreme Court), but when as in this case there is no controlling decision by their own court of appeals they should of course give respectful consideration to decisions by other courts.

*Withhart* was much like this case (though with an important distinction, as we'll see). The court held that a counterclaim against a seaman for property damages is not a "device" within the meaning of section 5 of the FELA. For this conclusion it relied primarily on *Cavanaugh v. Western Md. Ry.*, 729 F.2d 289 (4th Cir. 1984) (a decision by a divided panel—we cited Judge Hall's dissent earlier). *Cavanaugh* in turn had relied heavily on the concern expressed in the House Report on the bill that became the FELA that railroads were requiring their employees to sign waivers of liability. H.R. Rep.

No. 1386, 60th Cong., 1st Sess. 6-8 (1908). Those waivers exemplify the type of "contract" that section 5 of the FELA forbids, but section 5 forbids more besides, including "devices"—a point the court in *Cavanaugh* overlooked. It also overlooked the Supreme Court's observation in *Philadelphia, Baltimore & Washington R.R. v. Schubert*, 224 U.S. 603, 611 (1912), that "the evident purpose of Congress [in enacting section 5, which replaced a similar provision in a 1906 predecessor statute to the FELA] was to enlarge the scope of the section and to make it more comprehensive by a generic, rather than a specific, description. It thus brings within its purview 'any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act.' It includes every variety of agreement or arrangement of this nature . . . ." Later the Court remarked on the "comprehensive phraseology" of section 5. *Duncan v. Thompson*, 315 U.S. 1, 6 (1942).

The majority opinion in *Cavanaugh* was followed in two subsequent appellate cases, *Sprague v. Boston & Maine Corp.*, 769 F.2d 26, 29 (1st Cir. 1985), and *Nordgren v. Burlington Northern R.R.*, 101 F.3d 1246, 1251 (8th Cir. 1996) (another 2 to 1 decision), but its holding had been rejected by a prior case, *Stack v. Chicago, Milwaukee, St. Paul & Pac. R.R.*, 615 P.2d 457, 460-62 (Wash. 1980), and is in tension with *California Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 833 (9th Cir. 1989). That case holds that the shipowner cannot seek indemnity from a seaman whose negligence caused an injury to a seaman who is suing the shipowner. In effect, *California Home Brands* treats

such an indemnity claim as a "device" forbidden by section 5. The *Sprague* and *Nordgren* opinions do not add to the analysis in *Cavanaugh*.

Although we doubt that *Cavanaugh* and the cases following it—all but *Withhart* being FELA rather than Jones Act cases—were decided correctly, the case for barring an employer's counterclaim is stronger in the maritime setting in three important respects. It may thus be significant that *Stark*, which is contrary to the *Cavanaugh* line of cases (before *Withhart*), was, unlike them, a maritime case.

First, comparative negligence, today the law in most states, had not been clearly recognized in any state when the FELA was enacted in 1908, and was in force in only a handful of states when the Jones Act was enacted in 1920. Arthur Best, "Impediments to Reasonable Tort Reform: Lessons From the Adoption of Comparative Negligence," 40 *Ind. L. Rev.* 1, 17-22 (2007). When contributory negligence was king, the slightest negligence by the employer would bar his counterclaim against the employee—yet the employee could recover on his claim only by proving that the employer had been negligent. So except in the unlikely event that the personal injury and the property damage, though arising from the same incident, had been caused by unrelated negligent acts by the parties, a victory by the employee would, by establishing the employer's negligence—and hence the contributory negligence of the defendant with regard to his counterclaim for property damage—extinguish the counterclaim.

The approach in admiralty law was different. Until the Supreme Court discarded the rule of "divided damages" in *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975), in favor of the "pure" comparative negligence defense illustrated by our arithmetical example, the rule was "equal division of property damage whenever both parties are found to be guilty of contributing fault, whatever the relative degree of their fault may have been." *Id*. at 397. In the present case (had it arisen before 1975), this would mean that National, if it could prove any degree of fault on Deering's part, would be entitled to a $400,000 setoff against whatever damages Deering could prove, for he'd be liable for half the damage to the towboat.

So while in the reign of contributory negligence a counterclaim in an FELA suit would rarely have been an effective "device" for thwarting a railroad worker's negligence claim, even at the time the Jones Act was passed it would have been an effective device in a maritime case—indeed, it would have been more effective then than it is now. For with the replacement of the rule of divided damages by that of comparative negligence in 1975, slight negligence by the seaman will result in his bearing only a slight liability for the damage to the shipowner's property (in our example, $32,000, rather than $400,000 under divided damages), though, as in this case, his slight residual liability might be quite enough to make his entire personal injury claim evaporate if the shipowner invoked the Limitation of Liability Act.

And that is the second difference between the FELA and the Jones Act: the shipowner but not the railroad can

file an action for limitation of liability. It is the interaction of the two differences that produced our absurd but, as applied to the present case, entirely realistic consequence of National's position: Deering's assumed 4 percent responsibility for the property damage not only wipes out his personal injury claim because of the interaction of the comparative negligence doctrine with the limitation of liability statute, but leaves him owing money to the shipowner even though his injuries may have made him unemployable.

Third, it is uncertain whether in 1920 a shipowner could have sued a seaman for property damage. If such a suit was possible, it would doubtless have been governed by the rule of divided damages. But was it possible? Recall from our earlier discussion of the general admiralty law that a seaman's rights under that law (maintenance and cure, and lost wages, but damages comparable to those available in common law tort cases only if the injury was attributable to the ship's being unseaworthy) were more limited than the corresponding rights of negligence victims on land. Maybe the converse rights of shipowners against seamen who negligently damaged property were also limited—the absence of such cases supports such an inference. It would be odd if in enacting the Jones Act in order to give seamen the same broad rights that the FELA had conferred on railroad workers, Congress had left employers armed to nullify those rights (albeit only in the small set of unusual cases illustrated by this case) by filing property-damage counterclaims the purpose of which was to exempt the shipowner

from liability for a personal injury caused by the ship-owner's negligence.

These critical differences between the FELA and Jones Act contexts were overlooked in *Withhart*. There is no mention of limitation of liability; we assume the ship-owner did not seek it. When the limitation is not sought, because the value of the seaman's claim is less than the ship's value, the effect of the shipowner's counter-claim is likely to be much less dire than when a limita-tion of liability is sought. Suppose in the present case that the loss to National was $100,000 and Deering's damages $500,000 and he was deemed 20 percent at fault for the accident. Then his damages would be reduced only from $500,000 to $380,000 (his damages would be reduced by 20 percent, to $400,000, and National would subtract another $20,000 for Deering's share of responsibility for the property damage). That is a lot more than -$2,000.

Maybe, then, the "device" forbidden by section 5 should be confined, so far as counterclaims against seamen for property damage are concerned, to cases in which a limitation of the shipowner's liability combines with the counterclaim to wipe out a personal injury claim no matter how substantial. In this case, for example, even if Deering's damages were $5 million, or for that matter $5 billion, his recovery could well be a negative $2,000 if National's position were correct.

For the present then—and mindful that an implicit abrogation of a right of action (here a right to obtain compensation for negligently inflicted damage to prop-

erty) is unusual—rather than creating a conflict with the Fifth Circuit we hold merely that the one-two punch thrown by National by combining a property-damage counterclaim with a limitation of liability in order to wipe out a substantial personal injury claim under the Jones Act is a liability-exempting device forbidden by the Act. We leave for a future day (which may be long in coming, given the paucity of cases such as this) the resolution of the issue whether a shipowner who does not seek to limit his liability should nevertheless be forbidden to set off damages for negligent damage to property against a Jones Act claim.

We also need not decide how far our analysis applies to seamen's claims under general admiralty law, as distinct from the Jones Act; National does not argue that its counterclaim, if barred by the Jones Act as we hold, might nevertheless be maintainable against such claims. (And likewise it has forfeited any argument that it should be permitted to press its counterclaim if it drops its limitation of liability claim.) Its silence suggests awareness of the likely futility of such an argument. If our interpretation of "device" in the Jones Act is correct, it would be strange indeed had the Supreme Court, in determining the rights of seamen under general admiralty law (judge-made law, as we said), meant to arm shipowners with a "device" that would thwart those rights as effectively as it would thwart seamen's largely redundant rights under the Jones Act. Deering complains that the towboat's steering mechanism was defective, and if that is right and the defect caused (or contributed to causing) the accident, he has a claim

of unseaworthiness that is identical to his claim of negligence under the Jones Act. See, e.g., *Mahnich v. Southern S.S. Co.*, 321 U.S. 96 (1944); *In re Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1302 (7th Cir. 1992) (per curiam); *The City of Camden*, 292 F. 93, 95-96 (3d Cir. 1923).

A final possibility would be the shipowner's filing its property-damage claim as an independent suit rather than as a counterclaim to the seaman's personal injury claim. (It would not be a compulsory counterclaim, and so could be filed as a separate suit, if the Jones Act and general admiralty law bar such a counterclaim in a suit under the Act or the general law.) But by the same logic deployed above, such a suit filed alongside a limitation of liability action would be an impermissible device, as it would have the identical purpose and effect of preventing the seaman from obtaining the recovery to which the Jones Act and general admiralty law entitled him. In any event National has forfeited any argument that it is entitled to circumvent in this fashion the interpretation of "device" pressed by Deering and accepted by the district judge and by us.

The dismissal of National's counterclaim is

AFFIRMED.